**FIRST CITY, TEXAS—BEAUMONT, N.A. and Collecting Bank, National Association**

v.

**Jimmie D. TREECE, As Community Survivor of the Estate of Carl E. Treece, Deceased, Billy I. Ramsey, and John H. Kennamer, Jr.**

Civ. No. 1:92–CV–495.

United States District Court,
E.D. Texas,
Beaumont Division.

Feb. 24, 1994.

---

Lee Ann DeMonbreum, F.D.I.C. Legal Div., Dallas, TX, for plaintiff, F.D.I.C.

Kenneth D. McConnico, Kenneth D. McConnico, P.C., Webster, TX, for defendant, John H. Kennamer, Jr.

## MEMORANDUM AND ORDER

JOE J. FISHER, District Judge.

Pending before the court are cross motions for summary judgment filed by the plaintiff, the Federal Deposit Insurance Corporation, and the defendant, John H. Kennamer, Jr. For the reasons set forth in detail below, the court grants the Federal Deposit Insurance Corporation's Motion for Summary Judgment and denies John H. Kennamer, Jr.'s Motion for Summary Judgment.

### FACTS

This litigation began in a Texas state court some four years ago. When the case began it was simple enough. The plaintiff bank sought to enforce guaranty agreements against several defendants to collect the deficiencies on a series of notes. Over time, the composition and complexity of the case changed considerably. The plaintiff bank went into receivership, one defendant declared bankruptcy, another failed to answer, another was dismissed and the case was eventually removed to federal court. The pertinent facts are as follows.

The defendant, John H. Kennamer, Jr. ("Kennamer"), was a stockholder and member of the board of directors of Farmer's Discount Supply, Inc. ("Farmer's"), a farm supply store in Winnie, Texas. Carl Treece was Farmer's president, majority stockholder and the person responsible for the day-to-day operation of the store. On April 3, 1987, Carl Treece died unexpectedly. Shortly after his death, the board of directors, including Kennamer, agreed to allow Carl Treece's widow, Jimmie Treece ("Treece"), to continue operating the store in place of her late husband. Kennamer denies, however, that Treece was ever elected to the board, appointed president or given the authority to obligate Farmer's on any additional debt.

Almost immediately, Treece began to refinance Farmer's debt with First City National Bank of Beaumont ("First City"). Between May 6 and June 18, 1987, Treece executed three notes with First City which she signed as "Jimmie Treece, President." The total indebtedness was $78,858.[1] The notes were secured by Farmer's inventory and accounts receivable. A security agreement bearing Treece's signature and dated March 20, 1987,[2] is among the summary judgment evidence submitted by the parties.

In addition to the security agreement, the notes were backed up by guaranty agreements executed by each of Farmer's directors, including Kennamer. Prior to Carl Treece's death, Kennamer executed a guaranty agreement with First City which required him to personally guarantee Farmer's debt for up to $120,000.[3] The guaranty agreement stated that Kennamer would be personally liable for Farmer's debt even if the debt was executed by someone who lacked the necessary authority.

Not long after Treece refinanced the debt, Farmer's ran into financial problems. Sometime around June, 1987, Farmer's defaulted on the notes held by First City. Finally, on July 14, 1987, Farmer's closed its business and surrendered the collateral to First City. First City sold the collateral and applied the proceeds of the sale against the unpaid balance on the notes. After applying the proceeds, a deficiency remained on all three notes. Through February 18, 1994, the total amount of the deficiency, including unpaid interest, was $135,254.24.[4]

Meanwhile, First City, like so many Texas banks in recent times, was experiencing financial difficulties of its own. On April 19, 1988, First City entered into an Assistance Transaction with the Federal Deposit Insurance Corporation ("FDIC"). The purpose of the Assistance Transaction was to reorganize First City by forming a new bank holding company, First City Bancorporation of Texas, Inc., and various subsidiaries. First City, Texas—Beaumont ("New First City") was the subsidiary which assumed operations of the Beaumont branch.

To effectuate the Assistance Transaction, First City was essentially split in two. A new subsidiary, Collecting Bank, N.A. ("Collecting Bank"), was formed to handle First City's bad debts. Certain non-performing assets and delinquent loans were transferred to Collecting Bank pursuant to an Assignment and Participation Agreement. The Farmer's notes were among the assets transferred to Collecting Bank. After the transfer, New First City remained the holder of the notes while Collecting Bank became the beneficial owner.

---

1. The first note is dated May 6, 1987, and is payable to the order of First City in the original principal amount of $32,200.00. The second note is dated May 25, 1987, and is payable to the order of First City in the original principal amount of $29,543.42. The third note is dated June 18, 1987, and is payable to the order of First City in the original principal amount of $17,114.04.

2. The date on the security agreement, March 20, 1987, is some three weeks prior to Carl Treece's death. This mysterious date invites a host of possibilities which the defendant seizes upon in arguing his case.

3. The guaranty agreement was executed by Kennamer on November 16, 1986. It was submitted by both Kennamer and the FDIC as part of their summary judgment evidence.

4. The per diem interest on the notes from September 15, 1993, the date of the FDIC's motion for summary judgment, is as follows: Note 1—$10.19 per day; Note 2—$12.73 per day; Note 3—$6.47 per day.

Predictably, litigation over the notes and guaranties ensued. New First City and Collecting Bank filed suit in a Texas state court on January 31, 1990, seeking to recover the amount of the deficiency. Kennamer counterclaimed, alleging that First City had engaged in a fraudulent scheme to obligate the directors on debts they would not otherwise have agreed to assume. Specifically, Kennamer alleges First City pressured Treece to refinance the debt at a time when she was vulnerable to outside influence due to her husband's death. Kennamer's counterclaim seeks approximately $1.7 million for damage to his credit and business.

Unfortunately, efforts to rejuvenate New First City were not successful. On October 30, 1992, the Comptroller of the Currency declared New First City and Collecting Bank insolvent and appointed the FDIC as receiver. The FDIC entered into a Purchase and Assumption Transaction with Texas Commerce Bank for the purchase of New First City. Obviously, there was no buyer for Collecting Bank. The FDIC began liquidating Collecting Bank in its capacity as receiver for the failed institution. Among the liquidation assets of Collecting Bank were the Farmer's notes and guaranties.

Upon New First City and Collecting Bank's insolvency, the FDIC assumed control of this litigation.[5] On November 5, 1992, the FDIC intervened in the state court proceeding as plaintiff. The next day, the FDIC removed the case to federal court pursuant to 12 U.S.C. 1819(b)(2). Following the mandatory 90 day stay of proceedings under 12 U.S.C. § 1821(d)(12), the FDIC moved for summary judgment alleging that Kennamer's

affirmative defenses were barred as a matter of law.[6] Kennamer responded to the FDIC's motion and then filed his own motion for summary judgment arguing that under Texas law, his obligation to guaranty the Farmer's notes was discharged because of the forged security agreement.

## DISCUSSION

The FDIC advances three basic arguments in support of its Motion for Summary Judgment. First, the FDIC argues it has established all the essential elements of its claim against Kennamer and therefore, it is entitled to judgment for the total amount of the deficiencies on the notes. Second, the FDIC contends that Kennamer's affirmative defenses are barred by the *D'Oench, Duhme* doctrine, 12 U.S.C. § 1823(e) and the federal holder in due course doctrine. Finally, the FDIC argues that Kennamer's counterclaim is barred because he did not comply with the administrative procedures for determining claims. As a collateral matter, the FDIC maintains that it is entitled to attorney's fees as provided for in the guaranty agreement.

Kennamer's arguments, on the other hand, center on the conduct of First City. Kennamer asserts that First City fraudulently induced Treece to execute the notes, and he implies that Treece refinanced the debt solely as a result of duress. Kennamer also alleges that First City forged Treece's signature on the security agreement, amounting to fraud in the factum, and that such conduct operates as an exception to the *D'Oench, Duhme* doctrine. Kennamer then carries this argument one step further and contends

---

**5.** Because New First City was the holder of the notes while Collecting Bank was the beneficial owner, there was some confusion after the case was removed as to who the real party in interest actually was. Texas Commerce Bank, as purchaser of New First City, filed a motion to intervene on April 13, 1993, which was eventually granted. Texas Commerce Bank claimed to be the real party in interest to New First City's claims against Kennamer by virtue of the purchase and assumption transaction. On August 19, 1993, the FDIC, Texas Commerce Bank and Kennamer stipulated that the FDIC was the holder and owner of the notes and guaranty agreements, and they agreed that Texas Commerce Bank should be dismissed as a party. On August 25, 1993, the court entered an Order of Stipula-

tion of Dismissal of Texas Commerce Bank, and Texas Commerce Bank's claims against Kennamer were dismissed with prejudice. This resolved the question as to who the real party in interest was.

**6.** By the time the case was removed to federal court, Kennamer was the only remaining defendant. A default judgment was entered against Treece by the state court on January 14, 1992. Defendant Billy L. Ramsey filed a bankruptcy petition on November 4, 1991, and was discharged one year later. In light of his bankruptcy filing, New First City and Collecting Bank non-suited Ramsey in the state court action.

the forged signature on the security agreement invalidated not only First City's security interest, but also his obligation under the guaranty agreement. With respect to his counterclaim, Kennamer argues he was not required to follow the administrative procedures for presentation of claims because he was asserting it in a lawsuit against First City at the time the FDIC was appointed receiver. This, argues Kennamer, was sufficient to provide the FDIC with notice of his claim. The court will take up each of these arguments in turn.

## A. Summary Judgment in the Federal Courts

In the federal courts, a party is entitled to summary judgment if it can demonstrate there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); e.g., Celotex Corp. v. Catrett, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). The purpose of a summary judgment motion is to "pierce the pleadings and to assess the proof in order to see whether there is a genuine need for trial." Fontenot v. Upjohn Co., 780 F.2d 1190, 1196 (citing Advisory Committee Note to 1963 Amendment of Fed.R.Civ.P. 56(e), 28 U.S.C.App., p. 626). Summary judgment is not a "disfavored procedural shortcut, but rather ... an integral part of the Federal Rules as a whole, which are designed 'to secure the just, speedy and inexpensive determination of every action.' " Celotex, 477 U.S. at 327, 106 S.Ct. at 2554 (quoting Fed. R.Civ.P. 1). See also Gagne v. City of Galveston, 671 F.Supp. 1130, 1132 (S.D.Tex.1987) (summary judgment is not a disfavored procedure), aff'd, 851 F.2d 359 (5th Cir.1988).

■ The standard for granting a summary judgment motion is the same standard used for granting a directed verdict under Rule 50(a). Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 250, 106 S.Ct. 2505, 2511, 91 L.Ed.2d 202 (1986). Accordingly, summary judgment should be granted when the evidence would require a directed verdict for

the movant. Anderson, 477 U.S. at 251, 106 S.Ct. at 2511. The only difference between the two motions is the procedural stage at which they are made and the evidence on which they are based. Id. (quoting Sartor v. Arkansas Natural Gas Corp., 321 U.S. 620, 624, 64 S.Ct. 724, 727, 88 L.Ed. 967 (1944)). "In essence ... the inquiry under each is the same; whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." Anderson, 477 U.S. at 251, 106 S.Ct. at 2511.

Under Rule 56, the movant must demonstrate the absence of an issue of "genuine" fact. A fact issue is genuine if the record, taken as a whole, could lead the trier of fact to find for the nonmovant. First National Bank of Arizona v. Cities Services Co., 391 U.S. 253, 288–289, 88 S.Ct. 1575, 1592, 20 L.Ed.2d 569 (1968). As commentators Wright, Miller and Kane have pointed out,

> Summary judgment lies only when there is no genuine issue of material fact; summary judgment is not a substitute for the trial of disputed fact issues. Accordingly, the Court cannot try issues of fact on a Rule 56 motion but only is empowered to determine *whether there are issues to be tried.*

Charles A. Wright, Arthur R. Miller & Mary K. Kane, Federal Practice and Procedure, § 2712 p. 574–575 (emphasis added). See also Estiverne v. Louisiana State Bar Ass'n, 863 F.2d 371, 374 (5th Cir.1989) (summary judgment is inappropriate for resolving disputed fact issues).[7]

■ Although summary judgment should not be used to resolve disputed fact issues, it is uniquely suited to disposing of issues whose resolution depends entirely on the application of law. See generally Wright, Miller & Kane, supra, § 2712. In this situation, summary judgment obviates the need for a trial and "when appropriate, affords a merciful end to litigation that would otherwise be

---

7. As a general rule, the court should not usurp the functions of the jury on a motion for summary judgment. See Anderson, 477 U.S. at 249, 106 S.Ct. at 2510. However, in cases tried to the bench, such as this one, the court has somewhat more discretion to weigh the evidence and draw the necessary inferences, unless those inferences involve witness credibility or disputed material facts. See Matter of Placid Oil Co., 932 F.2d 394 (5th Cir.1991).

lengthy and expensive." *Fontenot,* 780 F.2d at 1197.

■ As stated above, the moving party must demonstrate there is no genuine issue of material fact and that it is entitled to judgment as a matter of law. Fed.R.Civ.P. 56(c); *e.g., Anderson,* 477 U.S. at 247, 106 S.Ct. at 2509. The showing required of the movant depends on whether that party bears the burden of proof on the issue at trial. If the movant bears the burden of proof at trial, it must come forward with evidence which establishes "beyond peradventure all of the essential elements of the claim or defense." *Fontenot,* 780 F.2d at 1194. If, on the other hand, the movant does not bear the burden of proof at trial, the moving party may meet its burden by pointing out the absence of evidence which supports the nonmovant's case. *Celotex,* 477 U.S. at 325, 106 S.Ct. at 2553; *Ocean Energy II, Inc. v. Alexander & Alexander, Inc.,* 868 F.2d 740, 747 (5th Cir. 1989).

■ Once the moving party has made the requisite showing, the burden shifts to the nonmovant to show that summary judgment should not be granted. *Matter of Gleasman,* 933 F.2d 1277, 1281 (5th Cir.1991). The nonmovant cannot rests on the pleadings alone; it must come forward with supporting affidavits, depositions, interrogatories or admissions. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Anderson,* 477 U.S. at 256, 106 S.Ct. at 2514; *Matshusita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 586, 106 S.Ct. 1348, 1355, 89 L.Ed.2d 538 (1986). The nonmovant must point out, with factual specificity, evidence demonstrating the existence of a genuine issue of material fact on every component of the nonmovant's case. *Dunn v. State Farm Fire & Casualty Co.,* 927 F.2d 869, 872 (5th Cir.1991). This is necessary because the motion for summary judgment requires the court to go beyond the pleadings and to assess the proof to determine whether a genuine fact issue exist which necessitates a trial on the merits. *Castillo v. Bowles,* 687 F.Supp. 277, 280 (N.D.Tex.1988). In assessing the proof, the court views the evidence in the light most favorable to the nonmovant. *Matshusita,* 475 U.S. at 587, 106 S.Ct. at 1356.

■ "Typically, suits on promissory notes provide fit grist for the summary judgment mill." *FDIC v. Cardinal Oil Well Servicing Co., Inc.,* 837 F.2d 1369, 1371 (5th Cir.1988) (citing *Lloyd v. Lawrence,* 472 F.2d 313 (5th Cir.1973)). This is especially true in cases such as this one where the application of legal doctrines can render disputed fact issues meaningless. With that said, the court now turns to an examination of the pleadings and an assessment of the proof in this case.

### B. The FDIC's Prima Facie Case

■ In order to obtain summary judgment, the FDIC must establish its prima facie case beyond "peradventure." *Fontenot,* 780 F.2d at 1194. To do this, the FDIC must show (1) the note and guaranty agreement are in existence and are valid, (2) the FDIC is the present holder of the note, (3) the maker has defaulted, and (4) the guarantor is liable under the guaranty agreement. *RTC v. Marshall,* 939 F.2d 274 (5th Cir.1991). In order to prove the fourth requirement, guarantor liability, the FDIC must show that the defendant signed the guaranty, that it holds the guaranty as legal owner and that a sum certain is due and owing on the guaranty. *RTC v. Crow,* 763 F.Supp. 887, 891–892 (N.D.Tex.1991).

The summary judgment evidence submitted by the FDIC conclusively establishes its prima facie case. The FDIC has submitted numerous documents including, *inter alia,* the notes, the guaranty agreement signed by Kennamer, publisher's affidavits and the affidavit of the FDIC Credit Specialist charged with custody and inspection of the New First City and Collecting Bank records. Kennamer apparently concedes that the FDIC has established its prima facie case because he offers no evidence to contradict it. By not doing so, he has failed to meet his burden of coming forward with evidence demonstrating the existence of a genuine issue of material fact. *See Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553. *See also Fontenot,* 780 F.2d at 1194. Therefore, summary judgment for the FDIC on its prima facie case is proper.

### C. The Defendant's Affirmative Defenses

In order to obtain a final, rather than a partial, summary judgment, the FDIC must

do more than simply establish all the essential elements of its claim; it must also negate Kennamer's affirmative defenses. *See Fontenot,* 780 F.2d 1190. Because Kennamer bears the burden of proof on his affirmative defenses, the FDIC may meet its summary judgment burden by pointing out the lack of evidence which supports the defendant's asserted defenses. *Celotex,* 477 U.S. at 324, 106 S.Ct. at 2553; *Ocean Energy II,* 868 F.2d at 747. It may also do this by pointing out specific legal doctrines which, as a matter of law, bar Kennamer's affirmative defenses.

Kennamer is asserting affirmative defenses sounding in fraud, duress and lack of authority. Specifically, Kennamer contends Treece lacked the authority to obligate Farmer's on the notes, she executed the notes under duress, she was fraudulently induced to refinance Farmer's existing debt, and further, that First City forged Treece's signature on the security agreement. Kennamer concludes by arguing that, under Texas law, the fraudulently obtained security agreement discharged his obligation to guarantee the notes.

The FDIC's argument is more straightforward. According to the FDIC, Kennamer's affirmative defenses, whatever they may be, are barred as a matter of law by the federal holder in due course doctrine, the *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e).

### 1. Federal Holder in Due Course Doctrine

■ The FDIC argues that it is a "holder" of both the notes and the guaranty agreement and therefore, because Kennamer's defenses are personal defenses, they are barred by the federal holder in due course doctrine. Kennamer disagrees. He maintains that the FDIC is not a "holder" because the guaranty agreement is not a negotiable instrument. Thus, he argues, the FDIC is subject to both real and personal defenses against enforcement of the guaranty agreement. The court agrees with Kennamer. The FDIC cannot be a holder in due course not only because the guaranty agreement is non-negotiable, but also because the FDIC is acting in its capacity as receiver in this action, rather than in its corporate capacity.

■ The FDIC is permitted to avail itself of the federal holder in due course doctrine when it acts in its corporate capacity pursuant to a purchase and assumption transaction. *See Gunter v. Hutcheson,* 674 F.2d 862 (11th Cir.1982), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982).[8] In essence, the doctrine provides the FDIC with "a complete defense to state and common law fraud claims on a note acquired by the FDIC in the execution of a purchase and assumption transaction...." *Gunter,* 674 F.2d at 873. The FDIC must take the instrument for value, in good faith and without actual knowledge of the alleged fraud at the time it enters into the purchase and assumption transaction. *Id.* The FDIC may become a holder in due course even in situations where it acquires the notes and guaranty after litigation involving them has already begun. *FDIC v. Orrill,* 771 F.Supp. 777 (E.D.La. 1991).

Kennamer is correct when he argues the guaranty agreement is not negotiable and therefore, the FDIC cannot be a holder in due course under federal common law. A guaranty is a non-negotiable instrument which is merely a contractual obligation. *Sunbelt Sav., FSB Dallas, Texas v. Montross,* 923 F.2d 353 (5th Cir.1991). Because of this non-negotiability, the FDIC cannot be a holder in due course of guaranties acquired in a purchase and assumption transaction. *Montross,* 923 F.2d at 357; *FDIC v. Payne,* 973 F.2d 403 (5th Cir.1992). Guaranties are not chameleons. They do not become negotiable simply because they have passed from a failed institution to the FDIC. "The FDIC is no alchemist and thus has no philosopher's

---

8. There is some question as to whether, and to what extent, *Gunter* has been adopted by the Fifth Circuit. *See FDIC v. Whitlock,* 785 F.2d 1335, 1339, n. 8 (5th Cir.1986) (questioning the wisdom of *Gunter* and its application to the case). *But see FSLIC v. Murray,* 853 F.2d 1251 (5th Cir.1988) (granting the FSLIC rights of a holder in due course for negotiable instruments acquired in a purchase and assumption transaction, but without explicitly adopting *Gunter* ). Despite this uncertainty, *Gunter* has been followed by several district courts. *See, e.g., Sunbelt Savings FSB, Dallas, Texas v. Amercorp Realty Corp.,* 730 F.Supp. 741 (N.D.Tex.1990).

stone with which to transform ... [a] non-negotiable contract of guaranty into a negotiable instrument." *Payne,* 973 F.2d at 408.

There is another reason, though, why federal holder in due course status is not available to the FDIC in this case. Federal holder in due course status is available to the FDIC only when its acts in its corporate capacity. *See Montross,* 923 F.2d 353 (5th Cir.1991); *FSLIC v. Murray,* 853 F.2d 1251, 1256 (5th Cir.1988); *FDIC v. Byrne,* 736 F.Supp. 727, 730 (N.D.Tex.1990) (The federal holder in due course doctrine "does not protect ... one who assumes [the failed institution's] liabilities...."). It is undisputed that the FDIC is acting in its capacity as receiver for Collecting Bank in this action. Because the FDIC is acting in its capacity as receiver, rather than in its corporate capacity, federal holder in due course status is not available, and Kennamer's defenses must be barred, if at all, on some other legal principle.

### 2. The D'Oench Duhme Doctrine and Section 1823(e).

Unable to cloak itself with federal holder in due course status, the FDIC turns its attention, and the court's, to the *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e). The FDIC argues that Kennamer's defenses are based on unwritten, unrecorded agreements, and such defenses are barred by the common law *D'Oench, Duhme* doctrine and its statutory counterpart, section 1823(e). Kennamer responds with a number of arguments in an attempt to avoid the preclusive effects of *D'Oench, Duhme* and section 1823(e).

The FDIC's ability to avoid defenses based on unwritten agreements began with the Supreme Court's decision in *D'Oench, Duhme & Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942). In *D'Oench, Duhme* the Court fashioned a common law rule which prohibits unwritten agreements from being used as a defense to an action by the FDIC. In essence, *D'Oench, Duhme* holds that a person who has dealt with a failed institution may not rely on unwritten agreements with the bank as a defense to the enforcement of a facially valid obligation. *D'Oench, Duhme,* 315 U.S. 447, 62 S.Ct. 676,

86 L.Ed. 956. "The test is whether the note was designed to deceive the creditors or the public authority, *or would tend to have that effect.*" *Id.,* at 460, 62 S.Ct. at 680 (emphasis added). *See also Beighley v. FDIC,* 868 F.2d 776, 784 (5th Cir.1989) (citing test). "Plainly, one who gives such a note to a bank with a secret agreement that it will not be enforced must be presumed to know that it will conceal the truth from the vigilant eyes of the bank examiners." *D'Oench, Duhme,* 315 U.S. at 460, 62 S.Ct. at 680.

The *D'Oench, Duhme* doctrine is premised on the federal policy to protect the FDIC, "and the public funds which it administers," against misrepresentations which could hinder the FDIC's ability to deal effectively with failed financial institutions. *See D'Oench, Duhme,* at 457, 62 S.Ct. at 679. *See generally Gunter v. Hutcheson,* 674 F.2d at 865–66 (discussing FDIC takeovers of failed institutions). If unwritten, unrecorded agreements could form the basis of a valid defense, the FDIC could not accurately assess the value of a bank's holdings. *See FDIC v. P.L.M. Int'l, Inc.,* 834 F.2d 248, 252 (1st Cir.1987). This in turn could hinder the FDIC's ability to carry out purchase and assumption transactions which "must be consummated with great speed, usually overnight, in order to preserve the going concern value of the failed bank and avoid an interruption in banking services." *Gunter,* 674 F.2d at 865. *See also Buchanan v. FSLIC,* 935 F.2d 83, 86 n. 5 (5th Cir.1991), *cert. denied* — U.S. —, 112 S.Ct. 639, 116 L.Ed.2d 657 (1991) (government's ability to rely on failed bank's records is primary purpose behind *D'Oench, Duhme* ).

The *D'Oench, Duhme* doctrine "has been extended considerably by the courts" since the Supreme Court's original decision. *In re CTS Truss, Inc.,* 859 F.2d 357, 361–62 (5th Cir.1988). "Since the initial statement of the doctrine in *D'Oench, Duhme,* the [courts have] expanded its preclusive effect well beyond the context of an oral 'secret agreement' between the bank and the borrower." *Kilpatrick v. Riddle,* 907 F.2d 1523, 1527 (5th Cir.1990). *See also Texas Refrigeration Supply v. FDIC,* 953 F.2d 975 (5th Cir.1992) (discussing the expansion of *D'Oench,*

*Duhme* by courts and Congress). Today, virtually all unwritten agreements are subject to the doctrine's preclusive effect, not just those between the borrower and the bank. *See RTC v. Oaks Apartments Joint Venture*, 966 F.2d 995, 998 (5th Cir.1992) (in addition to agreements with bank officials, doctrine also precludes enforcement of agreements not found on the bank's books). As the Fifth Circuit has aptly stated, "transactions that do not appear on the bank's books do not appear on the judicial radar screen either." *Bowen v. FDIC*, 915 F.2d 1013, 1016 (5th Cir.1990).

In 1950, Congress codified *D'Oench, Duhme* in what is now 12 U.S.C. § 1823(e).[9] Section 1823(e) requires agreements which "tend to diminish or defeat" the "interests" of the FDIC in any asset to meet its exacting standards. 12 U.S.C. § 1823(e). Specifically, the agreement must be (1) in writing, (2) executed contemporaneously with the acquisition of the asset by the bank, (3) approved by the bank's board of directors in compliance with standard procedures, and (4) maintained as an official record of the bank. *Id.* Originally, section 1823(e) was available to the FDIC only in its corporate capacity. *See, e.g., Beighley v. FDIC*, 868 F.2d 776, 783 (5th Cir.1989). In 1989, Congress amended section 1823(e) to make it available to the FDIC in its receiver capacity as well. *See Kilpatrick*, 907 F.2d at 1526 n. 4.

■ Section 1823(e) was intended to supplement *D'Oench, Duhme*, not to replace or preempt it. *See FDIC v. McClanahan*, 795 F.2d 512, 514 n. 1 (5th Cir.1986) ("It has not been suggested that the enactment of § 1823(e).... preempted the common law rule of *D'Oench, Duhme*."). *See also FDIC v. Hoover–Morris Enterprises*, 642 F.2d 785, 787 (5th Cir. Unit B 1981) (stating that both 1823(e) and *D'Oench, Duhme* are available to the FDIC). The two are not mutually exclusive, although they often lead to the same result. Thus, the FDIC may invoke the *D'Oench, Duhme* doctrine, section 1823(e) or both to bar defenses based on unwritten agreements.

■ Kennamer's first line of defense rests on his contention that Treece lacked the authority to obligate Farmer's on the notes. Kennamer admits that shortly after Carl Treece's death the board of directors agreed to allow Treece to operate the store. Kennamer adamantly denies, however, that Treece was ever given the authority to obligate Farmer's on any additional debt. It seems to the court that Kennamer would be foreclosed from asserting this defense based on Treece's apparent authority. Be that as it may, it is unnecessary to consider the issue of Treece's apparent authority, or her lack of actual authority, because this defense falls squarely within *D'Oench, Duhme*'s prohibition against unwritten agreements.

Kennamer's defense is rooted in an unwritten agreement. The decision by the board of directors to restrict Treece's authority does not appear in any writing, document or memorandum. It is nowhere to be found on New First City or Collecting Bank's books. Clearly, under the test enunciated in *D'Oench, Duhme*, the unwritten agreement would tend to deceive the bank examiners. When the FDIC took over Collecting Bank, they saw a facially valid note accompanied by a facially valid guaranty agreement. Nothing in the New First City or Collecting Bank records indicated that the note and guaranty could not be enforced according to their terms, and the *D'Oench, Duhme* doctrine prohibits Kennamer from proving otherwise.

It is also clear that Kennamer "lent himself to a scheme or arrangement" that was likely to mislead the FDIC. *See Buchanan*, 935 F.2d at 86. Kennamer admits that he took part in the decision to limit Treece's authority. This, by itself, was not a culpable action. The culpability arises from Kennamer's failure to reduce the agreement to writing and to take steps to ensure that First City was aware of Treece's limited authority. *See L & R Prebuilt Homes, Inc. v. New England AllBank for Sav.*, 783 F.Supp. 11, 15 (D.N.H.1992) (*D'Oench, Duhme* applies where the only element of fault is the bor-

---

9. Federal Deposit Insurance Act, Pub.L. No. 81–797, 64 Stat. 873 (1950) (codified as amended at 12 U.S.C. §§ 1811–32 (1982)).

rower's failure to reduce the agreement to writing).

Section 1823(e) yields the same result. The agreement which purportedly restricted Treece's authority clearly tends to diminish or defeat the FDIC's interest in the Farmer's notes. More importantly though, the agreement does not satisfy any of the four requirements; it is not in writing, it was not contemporaneously executed, it was not approved by First City's board of directors and it was not maintained as an official record of the bank. In short, because of *D'Oench, Duhme* and section 1823(e), Kennamer can not rely on Treece's lack of authority to avoid his obligation under the guaranty agreement.

■ Faced with the seemingly insurmountable hurdles of *D'Oench, Duhme* and section 1823(e), Kennamer attempts to avoid their preclusive effect on several grounds. First, he argues that First City misrepresented the need to refinance the debt to Treece, and further, that Treece executed the notes under duress. Kennamer contends that because First City's conduct amounted to fraudulent inducement, and also because Treece signed the notes under duress, neither 1823(e) nor *D'Oench, Duhme* applies.

Kennamer is wrong on both counts. Fraud in the inducement is barred by *D'Oench, Duhme* and 1823(e) to the same extent as other unrecorded agreements. *Langley v. FDIC,* 484 U.S. 86, 108 S.Ct. 396, 98 L.Ed.2d 340 (1987); *Kilpatrick,* 907 F.2d 1523. Duress is as well. Although some courts have held that defenses based on economic duress fall outside the *D'Oench, Duhme* doctrine and section 1823(e), these courts are in the minority. See, e.g., *RTC v. Ruggiero,* 756 F.Supp. 1092 (N.D.Ill.1991). The majority of courts, including one case affirmed by the Fifth Circuit, hold that economic duress is barred to the same extent as other personal defenses. *See FDIC v. Gettysburg Corp.,* 760 F.Supp. 115 (S.D.Tex. 1990), *aff'd without opinion, Unitedbank v. Gettysburg Corp.,* 952 F.2d 400 (5th Cir. 1992); *Desmond v. FDIC,* 798 F.Supp. 829 (D.Mass.1989); *FSLIC v. Maio,* 736 F.Supp. 1039 (N.D.Cal.1989).

Cut off from this line of attack, Kennamer attempts to characterize First City's conduct as fraud in the factum. Specifically, Kennamer alleges that Treece never signed the security agreement, but rather, that First City forged her signature. Kennamer points out that the date on the security agreement, March 20, 1987, is some three weeks prior to Carl Treece's death. Kennamer implies that the only conclusion that can be drawn from this date is that First City forged Treece's name. Thus, he argues, First City's conduct amounted to fraud in the factum, and the defense of fraud in the factum is not barred by *D'Oench, Duhme* or section 1823(e).

■ Kennamer is correct in one respect. Fraud in the factum is an exception to the *D'Oench, Duhme* doctrine. *See McLemore v. Landry,* 898 F.2d 996 (5th Cir.1990), *cert. denied* 498 U.S. 966, 111 S.Ct. 428, 112 L.Ed.2d 412 *Kilpatrick,* 907 F.2d at 1527, n. 6. However, even assuming that Kennamer's allegations are true, this defense is still "Duhmed" for two reasons. First, there is simply no evidence, other than the implication drawn from the date on the security agreement, that the instrument is a forgery. Kennamer bears the burden of proof on this issue and, as a result, he cannot rest on the pleadings alone. He must come forward with evidence which supports his contention, and he simply has not done so. Second and more importantly, even if the security agreement is a forgery, it would not relieve Kennamer's obligation under the guaranty agreement.

Because the guaranty agreement is not dependent on the presence of a valid security agreement, the defense of fraud in the factum would not discharge Kennamer's obligation to guarantee Farmer's debts. Kennamer does not dispute that Treece signed the notes. Nor does he dispute that he executed the guaranty agreement, which requires Kennamer to guaranty Farmer's debt whether secured or not. Nothing in the guaranty agreement discharges Kennamer's obligation if the security agreement is in some way defective. Even if the court were to strike the security agreement, the notes would remain due and owing, and Kennamer's obligation under the guaranty agreement would remain intact.

Kennamer responds by arguing that the forged signature invalidated not only the security agreement, but also his obligation to guaranty the notes.[10] He cites section 3.606(a)(2) of the Texas Business & Commerce Code as authority for his position.[11] The crux of Kennamer's argument rests on his belief that First City forged Treece's signature on the security agreement.

There are several problems with this argument. First, the guaranty agreement which Kennamer signed does not fall within section 3.606. Article 3 does not apply to all guaranties. In particular, it does not apply to continuing guaranties which merely guaranty overall indebtedness rather than a particular note. *First City Bank v. Air Capital Aircraft Sales,* 820 F.2d 1127 (10th Cir.1987); *Union Planters Nat. Bank of Memphis v. Markowitz,* 468 F.Supp. 529 (W.D.Tenn. 1979). This is because a continuing guaranty is not an "instrument" as that term is used in Article 3 and therefore, the guarantor is not a "party to the instrument." *First City Bank,* 820 F.2d at 1134 (and cases cited therein); *FDIC v. Hardt,* 646 F.Supp. 209 (C.D.Ill.1986); *FDIC v. Coleman,* 795 S.W.2d 706 (Tex.1990); *Simpson v. MBank Dallas, N.A.,* 724 S.W.2d 102 (Tex.App.—Dallas 1987, writ ref'd n.r.e.).

The rationale of this rule is premised on the difference between a guarantee of a specific note and a continuing guaranty. The court in *Union Planters* stated it best:

A continuing guarantor does not guarantee a particular note, but rather guarantees an overall indebtedness. A continuing guarantor is thus obliged to pay the debts of the defaulting principal whether those debts are secured by collateral or not. In short, a continuing guarantor cannot rely on the presence of collateral securing a particular note. As long as the continuing

guaranty in this case was in effect, nothing prevented [debtors] from incurring new debts to [creditor] secured by no collateral whatever.

*Union Planters Nat. Bank,* 468 F.Supp. at 535.

Kennamer's guaranty was continuing. The guaranty agreement itself states that it is "intended to be, and is, a continuing guaranty, and shall apply to and cover all indebtedness...." Another part of the agreement states "If any, or all, of the indebtedness hereby guaranteed be secured...." Notwithstanding this language, the guaranty agreement clearly has the effect of a continuing guaranty. It was executed prior to the notes and before the security agreement was signed, whether by Treece or someone else. It guaranteed Farmer's debts whether secured or unsecured. Clearly, the guaranty agreement was a continuing guaranty and not a guaranty of a specific note.

Assuming solely for the sake of argument that Kennamer's guaranty is encompassed within section 3.606, the section still does not apply to the facts of this case. First, there is authority which suggests the creditor must be in possession of the collateral before 3.606 applies. *See Commercial Credit Equip. Corp. v. Hatton,* 429 F.Supp. 997 (N.D.Tex. 1977). Neither First City, New First City or Collecting Bank was ever in possession of the collateral securing the Farmer's notes until it was surrendered to the bank pursuant to the security agreement. In addition, there is absolutely no authority which holds that section 3.606 discharges a continuing guaranty when the collateral is acquired by means of fraud or duress. On the contrary, the courts which have applied 3.606 have done so in situations very different from the one before this court.

10. This is sole issue on which Kennamer's motion for summary judgment is based. In his motion, Kennamer argues that his obligation to guarantee the notes was discharged by First City's "impairment" of the collateral; i.e. by forging Treece's signature on the security agreement. On this issue, Kennamer is considered the movant, and the allocation of summary judgment burdens will be adjusted accordingly.

11. The relevant portion of section 3.606 is as follows:

(a) The holder discharges any party to the instrument to the extent that without such party's consent the holder

....

(2) unjustifiably impairs any collateral for the instrument given by or on behalf of the party or any person against whom he has a right of recourse.

Typically, section 3.606 applies in situations where the creditor has increased the guarantor's liability by impairing the availability of the collateral to satisfy the debt. *See Advance Process Supply Co. v. Litton Industries Credit Corp.,* 745 F.2d 1076 (7th Cir.1984) (failure to perfect security interest); *Webb v. Finger Contract Supply Co.,* 447 S.W.2d 906 (Tex.1969) (impairment of subrogation rights); *Lawyers Title Ins. Corp. v. Northeast Texas Development Co.,* 635 S.W.2d 897 (Tex.App.—Tyler 1982, writ ref'd n.r.e.) (release of security interest in collateral). An impairment of collateral has also been found where the creditor failed to properly preserve the collateral's value. *First Nat. Bank, Giddings v. Helwig,* 464 S.W.2d 953 (Tex.Civ.App.—Austin 1971, no writ); *First Nat. Bank of Fort Worth v. Brown,* 172 S.W.2d 151 (Tex.Civ.App.—Ft. Worth 1943, error ref'd). Even where an impairment of collateral is found, the guarantor is only entitled to a pro tanto reduction in his obligation, not a complete discharge. *See Helwig,* 464 S.W.2d at 955.

■ In this case, assuming again for the sake of argument that First City actually forged Treece's signature on the security agreement, it did not increase Kennamer's liability under the guaranty agreement. On the contrary, it had the opposite effect. The proceeds from the sale of the collateral were applied to the notes which reduced the liability of the guarantors. Under these circumstances, the court cannot say that First City's conduct "impaired" the collateral as that term is used in Article 3.

Summing it all up, it is clear that Kennamer's affirmative defenses are barred by both the *D'Oench, Duhme* doctrine and section 1823(e), and the FDIC is entitled to judgment on this issue. In addition, Kennamer's obligation under the guaranty agreement is not discharged by section 3.606 of the Texas Business & Commerce Code, and as a result, his motion for summary judgment must be denied.

## D. The Defendant's Counterclaim

Kennamer is asserting a counterclaim for damage to his credit rating. Specifically, Kennamer contends that First City resorted to fraud in refinancing Farmer's debt because it misrepresented the need to execute the notes to Treece. According to Kennamer, First City then compounded the fraud by forging Treece's signature on the security agreement. Kennamer alleges that in the absence of First City's conduct, Farmer's would not have defaulted on its then existing debt, he would not be defending a lawsuit and his credit rating would not have suffered. Kennamer concludes that First City's actions resulted in an "unjust impairment of his credit," and he seeks damages of $1.7 million.

■ The FDIC argues that whatever claim Kennamer has, if any, is barred because he did not comply with the administrative procedures for determination of claims set out in 12 U.S.C. § 1821(d)(5), and therefore, the court lacks subject matter jurisdiction over his counterclaim. The FDIC is correct. Kennamer's failure to comply with the administrative procedures for the determination of claims set out in section 1821 bars his counterclaim. However, even if Kennamer had followed these procedures, the court believes his counterclaim would still be barred by the mirror-image rule of the *D'Oench, Duhme* doctrine.

The Financial Institutions Reform, Recovery, and Enforcement Act of 1989 ("FIRREA") set out a comprehensive administrative procedure for presenting claims to the FDIC. *See generally* 12 U.S.C. § 1821(d)(3)–(10). The overhaul of these provisions was prompted in part by Congress' desire to remedy the problems of the existing administrative scheme and also in response to the concerns the Supreme Court expressed in *Coit Independence Joint Venture v. Federal Sav. & Loan Ins. Corp.,* 489 U.S. 561, 109 S.Ct. 1361, 103 L.Ed.2d 602 (1989).[12] The purpose of this amended ad-

---

**12.** In *Coit,* the Supreme Court held that creditors were not required to exhaust their administrative claims before bringing suit against the FSLIC. "Congress granted FSLIC various powers in its capacity as receiver, but they do not include the power to adjudicate creditor's claims." *Coit,* 489 U.S. at 572, 109 S.Ct. at 1368. "[I]f Congress intended to confer adjudicatory authority upon FSLIC in its receivership capacity, it would have enacted ... provisions governing procedur-

ministrative scheme was to allow the FDIC to "deal expeditiously with failed depository institutions...." *Meliezer v. Resolution Trust Co.*, 952 F.2d 879, 881 (5th Cir.1992).

Section 1821 now provides that anyone wishing to assert a claim against a failed institution must present their claim to the FDIC in accordance with the procedures set out in that section. *See generally* 12 U.S.C. § 1821(d)(3)–(10). Compliance with section 1821 is a prerequisite to instituting suit. *Meliezer*, at 883; *Peoples State Bank v. Garrett*, 142 F.R.D. 438 (N.D.Tex.1991); *Connecticut Bank and Trust Co, N.A. v. CT Partners, Inc.*, 136 F.R.D. 347 (D.Conn.1991). Therefore, if the claims procedure has not been followed and the 180 day period for filing administrative claims has expired, the district court lacks subject matter jurisdiction over the claim. *Meliezer*, 952 F.2d at 883.

■ Section 1821 also applies to situations where the action is pending at the time the failed institution goes into receivership. *See* 12 U.S.C. § 1821(d)(6)(A)[13]. *See also United Bank of Waco, N.A. v. First Republic Bank Waco, N.A.*, 758 F.Supp. 1166 (W.D.Tex.1991) (compliance with section 1821 was required even though suit was being prosecuted at the time the institution failed).

Kennamer disputes this, arguing that a party to a pending suit is under no obligation to follow the administrative procedures in section 1821(d)(5). In support of his position, Kennamer cites *Kaplin v. Joseph*, 125 F.2d 602 (7th Cir.1942). *Kaplin* held that suits against national banks do not abate upon the appointment of a receiver and therefore, the Comptroller was not required to send notice where suit had been commenced prior to the institution's insolvency. *Kaplin*, 125 F.2d at 606. Although *Kaplin* may have been good law at one time, the court doubts that it is

today. The case was decided long before Congress overhauled the administrative remedies provision of Title 18, and the court declines to follow it.

This lawsuit was being prosecuted against Kennamer by First City at the time the institution was declared insolvent and went into receivership. The moment that Collecting Bank was declared insolvent and taken over by the FDIC, section 1821 applied. Thus, Kennamer was required to follow the administrative procedures set out in section 1821. By his own admission, Kennamer never filed a claim, and this is sufficient grounds for disallowing his counterclaim. *See United Bank of Waco*, 758 F.Supp. at 1168 (allowing claimants to forgo the requirements of section 1821 would render it meaningless). Therefore, Kennamer's counterclaim must be disallowed.

■ Kennamer argues, however, that the failure to file his claim is excusable because the FDIC did not satisfy its requirements under the statute. Specifically, Kennamer argues that he never received the claims presentation notice required by section 1821(d)(3)(C).[14]

Section 1821(d)(3)(C) requires the FDIC to mail individual notice to "any creditor shown on the institution's books." 12 U.S.C. § 1821(d)(3)(C). In addition, the FDIC must send notice to creditors not shown on the institution's books within 30 days after discovering their existence. § 1821(d)(3)(C)(ii). The parties do not state whether or not the lawsuit, which contained Kennamer's "claim," was shown on First City's books. Whether it was or not, in the court's opinion, is irrelevant because the mere failure of the FDIC to send notice does not relieve the claimant from the burden of complying with the administrative procedures set out in section 1821. *Meliezer*, 952 F.2d at 883.

al and substantive rights and providing for judicial review." *Id.* at 574, 109 S.Ct. at 1369.

**13.** Section 1821(d)(6)(A) deals with agency review and judicial determination of denied claims. It states in part:

Before the end of the 60–day period ... the claimant may request administrative review of the claim ... or file suit on such claim (*or*

*continue an action commenced before the appointment of the receiver*) in the district or territorial court of the United States....
12 U.S.C. § 1821(d)(6)(A) (emphasis added).

**14.** The affidavits and supporting evidence submitted by the FDIC conclusively establish that the FDIC satisfied the publication requirements of section 1821(d)(3)(B), and Kennamer does not dispute this.

In *Meliezer*, the Fifth Circuit was confronted with an identical argument. The plaintiffs argued that the Receiver's failure to send notice excused them from complying with the administrative procedures set out in section 1821. The Fifth Circuit disagreed and held there was "no statutory basis for this contention." *Meliezer*, at 883. "Federal agencies do not lose jurisdiction by their failure to comply with statutory time limits unless the statute demonstrates congressional intent that this result occur . . . ." *Meliezer*, at 883 (citing *United States v. Boccanfuso*, 882 F.2d 666, 671 (2nd Cir.1989)). Thus, under the holding of *Meliezer*, the FDIC's failure to send notice to Kennamer does not excuse his noncompliance with section 1821; his counterclaim is still barred.

■ Even if the court was inclined to accept Kennamer's argument regarding individual notice, his counterclaim would still be barred by the "mirror image rule" of the *D'Oench, Duhme* doctrine. In essence, claims which are the "mirror image" of the asserted defense are barred as a matter of law. *See Kilpatrick v. Riddle*, 907 F.2d 1523 (5th Cir.1990).[15] *See also FDIC v. Plato*, 981 F.2d 852 (5th Cir.1993); *Bell & Murphy & Assoc. v. Interfirst Bank Gateway*, 894 F.2d 750 (5th Cir.1990); *Beighly v. FDIC*, 868 F.2d 776 (5th Cir.1989); *FDIC v. Kasal*, 913 F.2d 487, 493 (8th Cir.1990) ("In no event can appellants make good their counterclaims against the FDIC . . . since those claims are based on their secret unwritten side agreements . . . ."). The purpose of this rule is to prevent defendants from making an "end run" around *D'Oench, Duhme* by transforming their barred defenses into counterclaims. *See Beighley*, 868 F.2d at 784.

Kennamer's counterclaim is nothing more than an inverse statement of his defense; i.e., a mirror-image of his defense. Kennamer's defense is based on First City's conduct which Kennamer claims was fraudulent. He argues, unsuccessfully, that this conduct relieves him of his obligation to guarantee the notes. His counterclaim, on the other hand, is also based on First City's allegedly fraudulent conduct. However, instead of relieving him of his obligation under the guaranty, Kennamer argues that First City's conduct damaged his credit rating, entitling him to damages. If his claim were allowed and Kennamer prevailed on this point, he could set off his obligation under the notes, which would have the same effect as an affirmative defense. This is exactly the type of inverse claim which the mirror image rule of *D'Oench, Duhme* is designed to preclude.

Because Kennamer failed to comply with the administrative procedures for the presentation of claims set out in section 1821, his counterclaim is barred. Moreover, even if Kennamer had followed the procedures in section 1821 and filed his administrative claim, his counterclaim would still be barred by the mirror-image rule of the *D'Oench, Duhme* doctrine. Either way, Kennamer's counterclaim is barred, and the FDIC is entitled to summary judgment on this issue.

## ATTORNEY'S FEES

The FDIC contends it is entitled to reasonable attorney's fees in this action. The FDIC bases it argument, not on statute, but on the terms of the guaranty agreement.

■ Guarantors of notes are generally liable for the costs of collection, including reasonable attorney's fees, if the guaranty agreement so provides. *See Bob Maxfield, Inc. v. American Motors Corp.*, 637 F.2d 1033 (5th Cir.1981), *cert. denied* 454 U.S. 860, 102 S.Ct. 315, 70 L.Ed.2d 158. This includes cases where the FDIC, acting as receiver for a failed bank, brings suit to enforce a guaranty. *FDIC v. Arcadia Marine, Inc.*, 642 F.Supp. 1157 (S.D.N.Y.1986). Even in situations where the guaranty itself does not provide for attorney's fees, the FDIC may still collect reasonable attorney's fees if the underlying note so provides. *FDIC v. Fagan*, 674 F.2d 302 (4th Cir.1982). The costs must be reasonable; language in guaranties providing for attorney's fees does not provide a basis for recovery in unusually long or com-

---

**15.** Judge Brown, who dissented on the main issue in *Kilpatrick*, nevertheless agreed with the majority that *D'Oench, Duhme* bars mirror image claims. "It is well established that when the *D'Oench, Duhme* doctrine applies, . . . the debtor will not be allowed to frame his defenses as an affirmative cause of action . . . ." *Kilpatrick*, 907 F.2d at 1530 (Brown, J., dissenting).

plex cases. *See In re Rubin Bros. Footwear, Inc.,* 119 B.R. 416 (S.D.N.Y.1990).

The guaranty agreement which Kennamer executed explicitly provides for attorney's fees. The agreement states that the guarantor shall be liable for "any and all reasonable costs of collection, including 10% of the said indebtedness additionally as attorney's fees should this contract be placed in the hands of attorneys for collection or should it be collected through any court; . . . ."

▮ The FDIC is clearly entitled to attorney's fees. The only question is whether or not the amount sought by the FDIC is reasonable in relation to the FDIC's collection efforts. After reviewing the evidence submitted by the FDIC, the court concludes that the fee sought is reasonable. The FDIC is seeking $4,500 as attorney's fees,[16] which is less than the 10% called for by the guaranty agreement. During the course of the FDIC's involvement in this litigation, the FDIC has drafted numerous pleadings, including a voluminous amount of briefs and reply briefs in support of its motion for summary judgment. In light of this, the court believes that $4,500 is a reasonable attorney's fee and awards this amount to the FDIC.

### INTERLOCUTORY DEFAULT JUDGMENT

As a final matter, the FDIC asks the court to render final an interlocutory default judgment entered against Jimmie Treece while this case was pending in the state court. From the record, it appears Treece never answered in the state court action, and First City moved for the entry of a default judgment pursuant to Texas Rule of Civil Procedure 239. On February 14, 1992, Judge Floyd of the 172nd Judicial District Court in Jefferson County, Texas entered an interlocutory default judgment against Treece for the full amount of the deficiencies. The FDIC is now asking this court to render that judgment final.

▮ Under Texas law, a final judgment is defined as one which disposes of all the parties and all the issues in a lawsuit. *Houston Health Clubs, Inc. v. First Court of Appeals,*

722 S.W.2d 692 (Tex.1986) (citing *Schlipf v. Exxon Corp.,* 644 S.W.2d 453 (Tex.1982)). If a default judgment does not dispose of all the parties and all the issues in a case, it is not final; rather, it is interlocutory. *See Houston Health Clubs,* 722 S.W.2d at 693; *Hunt Oil Co. v. Moore,* 639 S.W.2d 459 (Tex.1982). Although a judgment entered after a conventional trial on the merits is presumed final under Texas law, summary judgments and default judgments are entitled to no such presumption. *See Northeast Independent School Dist. v. Aldridge,* 400 S.W.2d 893 (Tex.1966); *Teer v. Duddleston,* 664 S.W.2d 702 (Tex.1984).

The default judgment entered against Treece in the state court was clearly interlocutory. The judgment did not dispose of all the parties or all the issues. This memorandum opinion is ample evidence of that. Indeed, the judgment signed by Judge Floyd states that it is interlocutory. Therefore, the true question for resolution is whether a federal court has jurisdiction to render final an interlocutory default judgment entered by a state court before the case was removed.

▮ After a case is removed from state court, the federal court acquires exclusive jurisdiction over the action. *Farias v. Bexar County Bd. of Trustees for Mental Health & Mental Retardation Services,* 925 F.2d 866 (5th Cir.1992). Prior rulings and orders made or issued by the state court remain in effect after removal, 28 U.S.C. § 1450, although they may be reviewed "de novo" by the federal court after the case is removed. *Blackburn, Inc. v. Harnischfeger Corp.,* 773 F.Supp. 296 (D.Kan.1991). *See also* 14A Charles A. Wright, Arthur R. Miller & Edward H. Cooper, *Federal Practice and Procedure,* § 3738. In appropriate circumstances, the federal court can set aside a default judgment entered by the state court prior to removal. *Cf. Robert E. Diehl, Inc. v. Morrison,* 590 F.Supp. 1190 (M.D.Pa.1984). *See also Kizer v. Sherwood,* 311 F.Supp. 809 (M.D.Pa.1970).

▮ The court sees no reason why the default judgment should be set aside. The

---

**16.** This total represents 36 hours of attorney's time at the rate of $125 per hour.

state court, after complying with all the prerequisites of procedural due process, found Treece in default and entered an interlocutory judgment accordingly. For this court to relitigate the entire matter would be a tremendous waste of judicial and public resources, and would undermine the type of judicial economy that section 1450 was designed to protect. As the Supreme Court has pointed out, section 1450 was "simply designed to deal with the unique problem of a shift in jurisdiction in the middle of a case...." *Granny Goose Foods, Inc. v. Brotherhood of Teamsters & Auto Truck Drivers Local No. 70 of Alameda County,* 415 U.S. 423, 435, 94 S.Ct. 1113, 1122, 39 L.Ed.2d 435 (1974). The section does not require the federal court to abide by every decision of the state court, nor does it force the federal court to undo all that was done before. It simply vests the federal court with a certain amount of discretion to adopt previous orders and findings of the state court, and this court elects to utilize that discretion in this case. Accordingly, the interlocutory default judgment entered against Treece is rendered final.

### CONCLUSION

In light of the foregoing analysis, it is accordingly ORDERED that the Federal Deposit Insurance Corporation's Motion for Summary Judgment is GRANTED, and further ORDERED that John H. Kennamer, Jr.'s Motion for Summary Judgment is DENIED. It is ORDERED that judgment be entered in favor of the FDIC and against Kennamer in the amount of $135,254.24 exclusive of attorney's fees. In addition, it is ORDERED that the interlocutory default judgment entered against the defendant, Jimmie Treece, is RENDERED FINAL. It is further ORDERED that the FDIC be awarded attorney's fees of $4,500 consistent with the findings above. All other relief not specifically granted is DENIED.

It is so ORDERED.