COMMONWEALTH LAND TITLE INSURANCE COMPANY, et al., Appellants,

v.

**Jim Larry NELSON and Sandra Nelson, Appellees.**

**No. A14–92–01204–CV.**

Court of Appeals of Texas, Houston (14th Dist.).

Opinion of Sept. 22, 1994 Withdrawn.

Substitute Opinion filed Sept. 29, 1994.

Rehearing Overruled Oct. 6, 1994.

Charles E. Fitch, Ben A. Baring, S. Bradley Todes, Gary D. Eisenstat, Houston, for appellants.

**314**

John B. Wallace, M. Karinne McCullough, Gregg S. Weinberg, Donald H. Zwernemann, Houston, for appellees.

Before J. CURTISS BROWN, C.J., and ELLIS and LEE, JJ.

## OPINION

LEE, Justice.

This suit arose out of the alleged loss of a first lien position held by Jim Larry Nelson and his wife Sandra (the Nelsons) securing a note held by the Nelsons. Commonwealth Land Title Insurance Company of Houston, Inc. (Commonwealth Title) and Commonwealth Land Title Insurance Company (Commonwealth Insurance) appeal from the trial court's judgment in favor of the Nelsons. The Nelsons perfected their own appeal to complain about the partial judgment notwithstanding the verdict, the election of damages, and the partial instructed verdict. We reverse and render in favor of Commonwealth Title and Commonwealth Insurance.

The Nelsons owned five acres of land in Harris County. They built a house and a horse barn on a portion of the acreage. In 1984, they became interested in selling part of the property. Mr. Nelson was introduced to Philip Clayton (Clayton), a real estate broker, and told Clayton that he was interested in selling the front two acres of his five acre tract. Although certain members of the Nelson and Clayton families were acquainted, Mr. Nelson had never met Philip Clayton before. Clayton subsequently found a buyer for the property and made an offer to the Nelsons on behalf of the buyer. After some negotiation, the Nelsons agreed to sell the two acres to "Anthony D. Caridi, Trustee and/or assigns" for $250,000. The earnest money contract called for a $100,000 cash down payment and the execution of a note to the Nelsons for the remaining $150,000. The note was to be secured by a first lien in favor

of the Nelsons on the two acres. Prior to closing, the earnest money contract was modified, pursuant to a separate document signed by the Nelsons, wherein Caridi assigned all of his rights as purchaser in the original contract to Graphic Investments Joint Venture No. 1 (Graphic). The modification document stated that Caridi originally entered the contract as trustee for Graphic. The earnest money contract provided that the deal would be closed with "Commonwealth Title Company."

Commonwealth Insurance is a title insurance company or underwriter. The Texas Insurance Code defines a "title insurance company" as "any domestic company organized under the provisions of this Act for the purpose of insuring titles to real property, any title insurance company organized under the laws of another state or foreign government meeting the requirements of this Act and holding a certificate of authority to transact business in Texas and any domestic or foreign company having a certificate of authority to insure titles to real estate within this state and which meet the requirements of this Act." TEX.INS.CODE ANN. art. 9.02(c) (Vernon 1981). Commonwealth Title is a title insurance agent authorized to issue the title policies of Commonwealth Insurance. A "title insurance agent" is defined under the Texas Insurance Code as "a person, firm, association, or corporation owning or leasing and controlling an abstract plant as defined by the Board, or as a participant in a bona fide joint abstract plant operation as defined by the Board, and authorized in writing by a title insurance company to solicit insurance and collect premiums and to issue or countersign policies in its behalf." TEX.INS.CODE ANN. art. 9.02(f) (Vernon 1981). Commonwealth Title is a wholly owned subsidiary of Commonwealth Insurance. Caridi was an escrow officer and fee attorney for Commonwealth Title.[1] D'Anna, Caridi's nephew, was

---

1. The Texas Insurance Code defines an escrow officer as "an officer or employee of a title insurance agent whose duties include any or all of the following: (1) countersigning title insurance policies, commitments and binders; or (2) supervising the preparation and delivery of title insurance policies, commitments and binders; or (3) receiving, handling, or disbursing escrow funds."

TEX.INS.CODE ANN. art. 9.02(g) (Vernon 1981). A fee attorney, according to Caridi's testimony, is an attorney who has the authority to conduct closings for real estate transactions upon which a policy of title insurance is to be issued. He is entitled to compensation, based on his agreement with the title insurance company, for con-

also an escrow officer for Commonwealth Title. According to Mr. Nelson, Clayton suggested that Commonwealth Insurance and Commonwealth Title be used for title insurance and the closing transaction. Mr. Nelson agreed and this was reflected in the earnest money contract.

The closing date was set for April 11, 1985. Prior to the closing, the Nelsons took the note and the earnest money contract to their attorney, John Buvens, and asked him to look over the documents. Buvens noticed that the note was not dated and called D'Anna at Commonwealth Title to apprise him. D'Anna stated that the note would be dated at the closing. Apparently Buvens did not find fault with any other provisions in the note or the contract. On April 11, 1985, the Nelsons went to the Houston office of Commonwealth Title for the closing. They met with a woman and signed some papers. The woman told them that not all of the closing documents were ready and that they would have to be signed later. The Nelsons left the office but later that same day received a call from Clayton's secretary. She said that the other closing documents were ready to be signed. The Nelsons met with her at their bank and signed the remaining papers. At no time during the closing did the Nelsons have any contact or conversations with Caridi or D'Anna.

After the closing, but on the same day, Graphic sold the property to Allied Southern Equities (Allied). The sale from Graphic to Allied was financed by a loan from First Bank & Trust, Tomball (First Bank). In connection with the sale from the Nelsons to Graphic and Graphic to Allied, several documents were forged, including a subordination agreement purporting to subordinate the Nelsons' first lien to the lien taken by First Bank. In addition to the subordination agreement, Caridi testified that the original earnest money contract, wherein the Nelsons were to sell the two acres to "Anthony D. Caridi, Trustee," was a forgery. He stated that he did not sign the contract and that in fact, Clayton admitted to the forgery and wanted Caridi to ratify it. Caridi refused. This explains the modification agreement, ducting the closing portion of the title insurance

i.e., the change in the name of the buyer from Caridi to Graphic. The subordination agreement and a deed retaining a vendor's lien were not signed by the Nelsons; rather, their signatures were forged. The subordination agreement was filed of record by Commonwealth Title without the Nelsons' knowledge. The evidence showed that the forged document was drafted by Caridi's office at D'Anna's request. Commonwealth Title claimed that copies of all of the documents were sent to the Nelsons after the closing. The Nelsons claim that they did not receive the documents and did not learn about the forgeries until 1988.

The Nelsons received the required annual installments due on the note in April, 1986 and April, 1987. In July or August of 1987, the Nelsons learned that First Bank had foreclosed on the property under its "first lien" when Allied, the second purchaser, defaulted on its loan commitment. The property had been foreclosed on by First Bank in 1986.

In July, 1988, after the Nelsons failed to receive the third installment on the note, they contacted Morris Hamm, an attorney. Hamm collected all of the relevant documents from the real property records. At that time, the Nelsons learned about the forged documents. Sometime prior to the Nelsons' discovery, First Bank failed and was taken over by the FDIC. On July 6, 1988, the FDIC, in its capacity as liquidator of First Bank, sold the Nelsons' two acres to Oscar and Suzanne Bonner (the Bonners). To finance the purchase, the Bonners executed a note to Home Savings of America, F.A. for $51,000.

On November 29, 1988, Hamm sent a written demand and claim on behalf of the Nelsons to Commonwealth Insurance. The letter stated:

> . . . the services provided by your company and its agents as independent escrow and closing agents were represented to be of one kind or quality when they were of another in that an instrument was forged with my clients' signatures and recorded through your agents in a manner that conducting the closing portion of the title insurance
transaction.

stituted a fraud on my clients depriving them of their rightful lien position and eventually causing the loss of the security for their note due from the purchasers of the property.

Approximately two weeks later, Commonwealth Insurance responded to Hamm through a letter from Robert M. Galperin, an attorney for Commonwealth Insurance. In the letter, Galperin advised the Nelsons that after a "lengthy" investigation, both Commonwealth Insurance and Commonwealth Title agreed that the subordination agreement was a forgery. The letter further advised that because the document was forged, ". . . the insureds presently possess a lien against the subject property which is and always has been superior to the lien in favor of First Bank & Trust identified in the Subordination Agreement." The letter also stated that First Bank's foreclosure and the subsequent sale by the FDIC to the Bonners was ineffective to disturb the Nelsons' superior lien. The letter concluded by stating that the Nelsons had not suffered any compensable loss under their title insurance policy because they still had their first lien and could seek foreclosure.

The Nelsons declined to foreclose and filed suit against Commonwealth Insurance, Commonwealth Title, Caridi, D'Anna, Clayton, Buvens, the Bonners, and Home Savings. In their second amended petition, they requested that the court reform the deed to reserve a vendor's lien and superior title in them and allow foreclosure. Alternatively, they claimed that the deed should be rescinded because it was procured through fraud. The Nelsons also alleged numerous causes of action against the various defendants: negligence, violations of the Texas Deceptive Trade Practices—Consumer Protection Act (DTPA) and the Texas Insurance Code, fraud, breach of contract, breach of fiduciary duty, fraud in a real estate transaction under the Texas Business and Commerce Code, failure to deal in a commercially reasonable manner, and negligent misrepresentation. The claims against Buvens were severed pri-

or to trial. Caridi filed for bankruptcy and was dismissed from the case.

After the Nelsons presented all of their evidence to the jury, the defendants rested without putting on any evidence. After the Nelsons rested, each side moved for instructed verdicts. The Nelsons moved for an instructed verdict/default judgment against D'Anna. While D'Anna did file a written answer in response to the Nelsons' petition, he failed to appear in court for the trial. The trial court granted the Nelsons an instructed verdict on their claims against D'Anna.[2] Commonwealth Insurance and Commonwealth Title also moved for an instructed verdict on all causes of action alleged against them by the Nelsons. In their petition, the Nelsons alleged the following claims against Commonwealth Insurance: negligence, violations of the DTPA and the Texas Insurance Code, breach of fiduciary duty, fraud, breach of contract, failure to deal in a commercially reasonable manner, fraud in a real estate transaction, and misrepresentation. The court granted Commonwealth Insurance an instructed verdict on all of the claims brought against it except violations of the DTPA and the Texas Insurance Code and failure to deal in a commercially reasonable manner. The Nelsons brought the same claims against Commonwealth Title except they did not allege fraud in a real estate transaction. Commonwealth Title also moved for instructed verdict as to all of the Nelsons' claims and the trial court granted the motion except as to negligence and violations of the DTPA and the Texas Insurance Code.

On May 12, 1992, the Nelsons filed a written motion to non-suit their claims for reformation and rescission and trespass to try title. The trial court granted this motion by written order of even date. On that same day, the jury returned a verdict in favor of the Nelsons on all questions. On July 13, 1992, the trial court entered a final judgment based on the jury's verdict. In its judgment, the trial court first ruled that both Commonwealth defendants were entitled to a partial judgment notwithstanding the verdict in that

**2.** In their second amended petition, the Nelsons made claims against D'Anna for: negligence, vio-

lations of the DTPA, breach of fiduciary duty, and fraud.

the jury's answers to sub-parts "b" and "c" on all of the damages issues would be disregarded. The court also declined to enter judgment for the Nelsons for the $150,000 face value of the title insurance policy. Sub-part "b" of the damage questions asked the jury what sum of money would compensate the Nelsons for the "[v]alue of first lien lost by Nelsons." Sub-part "c" asked about "lost revenues on the note owed by Graphic Joint Venture No. 1." Second, the court stated that the Nelsons had elected to recover damages under certain theories without waiving their right to recover under other causes of action and thus, judgment would be granted against Commonwealth Insurance under the DTPA and Texas Insurance Code, entitling the Nelsons to actual damages, prejudgment interest, attorney's fees, and statutory treble damages. The judgment recited that the Nelsons, based on their election, were entitled to judgment against Commonwealth Title for actual damages, prejudgment interest, and exemplary damages. As a result, the court decreed that the Nelsons recover: (1) $524,000 in actual damages from Commonwealth Insurance, Commonwealth Title, D'Anna, and Clayton, jointly and severally, plus pre- and postjudgment interest; (2) $1,048,000 in statutory damages based on the DTPA and Texas Insurance Code (two times the amount of the actual damages) from Commonwealth Insurance and D'Anna, jointly and severally, plus pre- and postjudgment interest; $605,220 (35% of the recovery) in attorney's fees from Commonwealth Insurance and D'Anna; $2,096,000 in exemplary damages (four times the amount of the actual damages) from Commonwealth Title; $200,000 in exemplary damages from Clayton for fraud, gross negligence, and breach of fiduciary duty.

As to whether the Nelsons have a lien on the property, the trial court ruled that the Nelsons have a "good and valid first lien and prior lien" against the two acres sold to Graphic. Lastly, the court dismissed the Bonners and Home Savings from the suit ruling that no party should take anything from them.

Commonwealth Insurance and Commonwealth Title (hereinafter "Commonwealth" when reference is made to both entities) filed this appeal challenging the judgment rendered in favor of the Nelsons. The Nelsons filed a cross-appeal complaining about the partial judgment notwithstanding the verdict, the election of damages, and the partial instructed verdict.

In point of error one, Commonwealth alleges that the trial court erred in rendering judgment for the Nelsons for any damages because the Nelsons still have a good and valid first lien against the property in dispute. In their first cross-point, the Nelsons contend that the trial court erred in partially granting a judgment notwithstanding the verdict that took away their damages for sub-parts "b" and "c" and instead imposing a first lien on the property. Because both of these points concern whether the Nelsons have a valid first lien on the property, they will be considered together.

Throughout the trial, the Nelsons claimed that their lien position was lost and they were therefore unable to foreclose when Graphic defaulted on the note in April of 1988. Commonwealth contested this assertion. The trial court disagreed with the Nelsons and in its judgment ruled that they still had a valid first lien against the property. The Nelsons argue that their lien is invalid because: (1) the execution and recording of the forged subordination agreement and deed retaining the vendor's lien subordinated the Nelsons deed of trust lien to First Bank's lien and the foreclosure by First Bank cut off the Nelsons deed of trust lien; and (2) the *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e) prevent the assertion of the invalidity of the forged subordination agreement against the FDIC as liquidator of First Bank, or its grantees, the Bonners.

■ The Nelsons first argue that they do not have a good and valid first lien because the deed of trust, which was not forged, specifically incorporates the deed retaining the vendor's lien by reference and that the incorporation renders the deed of trust a forged instrument as well. Therefore, this issue is: Does the fact that a deed of trust incorporates a forged document render the deed of trust a forgery? We hold that it does not.

■■ A forged deed is void *ab initio* and inoperative. *Dyson Descendant Corp. v. Sonat,* 861 S.W.2d 942, 947 (Tex.App.—Houston [1st Dist.] 1993, no writ); *Gaynier v. Ginsberg,* 715 S.W.2d 749, 757 (Tex.App.—Dallas 1986, writ ref'd n.r.e.); *Turner v. Germany,* 94 S.W.2d 1177, 1179 (Tex.Civ.App.—Texarkana 1936), *rev'd on other grounds,* 132 Tex. 491, 123 S.W.2d 874 (1939). Title to land cannot pass under a forged deed. *Bellaire Kirkpatrick Joint Venture v. Loots,* 826 S.W.2d 205, 207 (Tex.App.—Fort Worth 1992, writ denied); *1st Coppell Bank v. Smith,* 742 S.W.2d 454, 461 (Tex.App.—Dallas 1987, no writ). The fact that the grantee and his assigns are innocent purchasers makes no difference because no person can be an innocent purchaser of land where there is a forgery in the chain of title. *Dyson Descendant,* 861 S.W.2d at 947; *Bellaire Kirkpatrick,* 826 S.W.2d at 210; *Turner,* 94 S.W.2d at 1179. A forged deed lacks effectiveness *ab initio* and neither consent, waiver, estoppel, implications, delivery, **nor recording** can give any legal effect to such an instrument. *Dyson Descendant,* 861 S.W.2d at 947 (recording); *Bellaire Kirkpatrick,* 826 S.W.2d at 210 (ratification); *Turner,* 94 S.W.2d at 1179 (estoppel); 30 Tex.Jur. *Deeds* § 59 (1983) (consent, waiver, implications, and delivery) (emphasis added).

Therefore, it is clear that in this case the subordination agreement and the deed retaining the vendor's lien were void *ab initio* and inoperative to pass title. Black's defines "void" as:

Null; ineffectual; nugatory; having no legal force or binding effect; unable, in law, to support the purpose for which it was intended. [citation omitted] An instrument or transaction which is wholly ineffective, inoperative, and incapable of ratification and which thus has no force or effect so that nothing can cure it. [citation omitted]

Black's Law Dictionary 1573 (6th ed. 1990).

"Void *ab initio*" is defined to mean that the document in question is "null from the beginning." *Id.* at 1574. Thus, when a document is void or void *ab initio* it is as if it did not exist because it has no effect from the outset. The Nelsons would have this court hold that a valid document, one that is not forged and is properly executed, becomes invalid simply because it incorporates a document that is inoperative and void *ab initio.* We decline. A valid document that references a void document in effect references nothing in the eyes of the law. To hold otherwise would insure the elimination of liens, etc. in a chain of title by mere reference to forgeries in valid lien documents. This would create a situation ripe for abuse.

The only case that the Nelsons rely on in support of their argument is *Peat Marwick Main v. Haass,* 775 S.W.2d 698 (Tex.App.—San Antonio 1989), *rev'd,* 818 S.W.2d 381 (Tex.1991). We hold that the case is inapposite. In *Peat Marwick,* an accounting firm brought suit against Haass claiming damages from the breach of a partnership agreement. 775 S.W.2d at 701. Haass claimed, among other things, that while he had signed a merger agreement, he had not signed the partnership agreement. *Id.* The court held that because the merger document incorporated the partnership agreement, Haass became bound by the partnership agreement when he signed the merger agreement. *Id.* at 702.

*Peat Marwick* does not involve deeds, deeds of trust, or real property of any kind. Further, there were no allegations in *Peat Marwick* that any of the documents were forged. Thus, there were no void documents involved. Rather, the issue was whether Haass was bound by a partnership agreement he did not sign by virtue of the fact that he signed a valid agreement that incorporated another valid agreement. The court held that he was so bound. The court did not hold that a valid document that incorporates a void document also becomes void. *Peat Marwick* does not support the Nelsons' position. Thus, the deed of trust in this appeal was valid.

■ The deed of trust supports the trial court's finding that the Nelsons have a good and valid first lien. The recorded deed of trust states that its purpose was to secure the payment of the note to the Nelsons. Specifically, it provides that "the lien hereby created shall take precedence over and be a prior lien to any other lien of any character

... hereafter created on the above described property." It further stated:

> This Deed of Trust is cumulative of and in addition to the Vendor's Lien. It is expressly agreed that the Vendor's Lien shall not operate as a waiver of this lien created by this Deed of Trust, it being agreed that the holder of the herein described Note may foreclose under either or both of said liens, as holder may elect, said Deed of even date herewith together with its record, being here referred to and made part of this instrument.

This makes it clear that the first lien created by the deed of trust is independent and cumulative of the vendor's lien contained in the forged deed. Thus, the Nelsons' have a first lien based on the unforged deed of trust.

█ Appellees/cross-appellants next allege that the *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e) prevent any assertion that the subordination agreement is invalid. This contention is incorrect. The *D'Oench, Duhme* doctrine, a rule of federal common law that originated in *D'Oench, Duhme and Co. v. FDIC,* 315 U.S. 447, 62 S.Ct. 676, 86 L.Ed. 956 (1942), prevents an obligor from asserting as a defense to a collection suit by the FDIC an oral side agreement with the failed depository that alters the terms of a facially unqualified note. *Stiles v. Resolution Trust Corp.,* 867 S.W.2d 24, 25 (Tex. 1993). In *D'Oench,* the defendant sold some bonds to a bank and in a scheme with the bank, executed notes payable to the bank so that if the bonds defaulted, the bank would not have to show the default on its books. 315 U.S. at 454, 62 S.Ct. at 678. The receipts for the notes, which were not part of the bank's records, stated that the notes would not be called for payment. *Id.* The bonds defaulted and when the bank was taken over by the FDIC, the FDIC, unaware of the "side agreement" between the bank and the defendant, sued to collect on the notes. *Id.* The defendant asserted as a defense to the suit the agreement with the bank that the notes would not be called for payment. *Id.* The United States Supreme Court held

that the defendant was estopped from asserting any defense based on the oral side agreement even though the defendant did not know at the time of the execution of the notes that they would later be used to deceive the FDIC. *Id.* at 460, 62 S.Ct. at 680. The Court stated:

> The test is whether the note was designed to deceive the creditors or the public authority or would tend to have that effect. It would be sufficient in this type of case that the maker lent himself to a scheme or arrangement whereby the banking authority on which [the FDIC] relied in insuring the bank was or was likely to be misled.

*Id.* Thus, the essence of the doctrine is that a person who has dealt with a failed institution may not rely on unwritten agreements with the bank as a defense to the enforcement of a facially valid obligation. *First City, Texas—Beaumont v. Treece,* 848 F.Supp. 727, 736 (E.D.Tex.1994). In other words, the FDIC is entitled to rely on the official bank records which set forth the rights and obligations of the bank and of those to whom the bank lends money.

The doctrine is premised on the federal policy to protect the FDIC "and the public funds which it administers," against misrepresentations which might undermine the FDIC's ability to deal effectively with failed banks. *Id.* If oral side agreements were allowed to serve as valid defenses, the FDIC could not accurately assess the value of a bank's holdings, thereby hindering its ability to carry out transactions necessary to preserve the value of the failed bank and avoid interruptions in banking services. *Id.* (citing *Gunter v. Hutcheson,* 674 F.2d 862, 865 (11th Cir.1982), *cert. denied,* 459 U.S. 826, 103 S.Ct. 60, 74 L.Ed.2d 63 (1982)).

In 1950, Congress essentially codified the Court's holding in *D'Oench* when it enacted 12 U.S.C. § 1823(e) (1989). This provision sets out the standards a collateral or side agreement must satisfy to qualify as a defense against the FDIC's enforcement of obligations acquired when a bank or savings and loan is taken over.[3] It requires agree-

**3.** Section 1823(e) states:

> No agreement which tends to diminish or defeat the interest of the Corporation in any asset

ments which "tend to diminish or defeat" the "interests" of the FDIC in any asset to meet its exacting standards. *Treece,* 848 F.Supp. at 737. The section was intended to supplement the *D'Oench, Duhme* doctrine, not to replace or preempt it. *Id.* The two are not mutually exclusive, though they often lead to identical results. Therefore, the FDIC may invoke the *D'Oench, Duhme* doctrine, section 1823(e), or both to bar defenses based on unwritten agreements.

Since its inception in 1942 and its codification in 1950, the scope of the *D'Oench, Duhme* doctrine has been expanded by the courts. *See, e.g., Langley v. FDIC,* 484 U.S. 86, 92–93, 108 S.Ct. 396, 401–402, 98 L.Ed.2d 340 (1987). A review of the relevant caselaw shows that "[s]ince the initial statement of the doctrine in *D'Oench, Duhme,* the Court has expanded its preclusive effect well beyond the context of an oral 'secret agreement' between the bank and borrower." *Kilpatrick v. Riddle,* 907 F.2d 1523, 1527 (5th Cir.1990), *cert. denied,* 498 U.S. 1083, 111 S.Ct. 954, 112 L.Ed.2d 1042 (1991). *See also Texas Refrigeration Supply v. FDIC,* 953 F.2d 975 (5th Cir.1992) (discussing the expansion of *D'Oench, Duhme* by courts and Congress). The doctrine is so broad now that the Fifth Circuit noted in *Bowen v. FDIC,* 915 F.2d 1013, 1015 (5th Cir.1990), "... the doctrine has evolved to a rule that today is expansive and perhaps startling in its severity."

■ At trial, the Nelsons claimed that application of the *D'Oench, Duhme* doctrine and 12 U.S.C. § 1823(e) precluded the assertion that the subordination agreement was forged because when the FDIC took over First Bank, it was entitled to rely on the bank's records and the subordination agreement, though forged, was part of those records. The argument continued as follows: because the bank's records included the forged agreement, no evidence was admissible to go behind the bank's records, i.e., the forged subordination agreement, to prove that First Bank's alleged first lien was invalid because of the forgery. Essentially, the argument is that if the FDIC or its assignee takes under a void instrument that is part of the bank's records, the forged instrument becomes valid and effective by virtue of the *D'Oench, Duhme* doctrine. We disagree.

While the doctrine and section 1823(e) cut off many claims and defenses that might be asserted against the FDIC, neither the common-law doctrine or section 1823(e) insulate the FDIC or those who take through the corporation from every defense asserted or every claim made against a defunct bank. *Resolution Trust Corp. v. Dunmar Corp.,* 7 F.3d 1006, 1014 (11th Cir.1993) (the statute and the doctrine taken together do not cut off all claims against the RTC); *Buchanan v. Federal Sav. and Loan Ins. Corp.,* 935 F.2d 83, 85 (5th Cir.1991) (*D'Oench, Duhme* doctrine does not preclude all claims against FSLIC); *Federal Deposit Ins. Corp. v. McClanahan,* 795 F.2d 512, 515 (5th Cir. 1986) (*D'Oench, Duhme* doctrine does not cut off all. defenses against FDIC); *Federal Deposit Ins. Corp. v. Powers,* 576 F.Supp. 1167, 1171 (N.D.Ill.1983) (section 1823 does not preclude all challenges against the FDIC).

The defense at issue in this case is forgery, and the question is whether that defense is precluded under *D'Oench, Duhme* or section 1823(e). Forgery is fraud in the factum as

acquired by it under this section or section 1821 of this title, either as security for a loan or by purchase or as receiver of any insured depository institution, shall be valid against the Corporation unless such agreement—
(1) is in writing,
(2) was executed by the depository institution and any person claiming an adverse interest thereunder, including the obligor, contemporaneously with the acquisition of the asset by the depository institution,
(3) was approved by the board of directors of the depository institution or its loan committee, which approval shall be reflected in the minutes of said board or committee, and

(4) has been, continuously, from the time of its execution, an official record of the depository institution.
12 U.S.C. § 1823(e) (1989). (bold-type in the original) We note here that while the common-law doctrine and section 1823(e) specifically pertain to the FDIC, section 1441a(b)(4) states that the Resolution Trust Corporation (RTC) has the same powers as the FDIC. 12 U.S.C. 1441a(b)(4) (1989). Further, caselaw has held that the *D'Oench, Duhme* doctrine and section 1823(e) apply to the RTC as well as the FDIC. *See McDonald v. Foster Mortgage Corp.,* 834 S.W.2d 573, 576 (Tex.App.—Houston [14th Dist.] 1992, writ denied).

opposed to fraud in the inducement. The defense of fraud in the inducement is cut off by the *D'Oench, Duhme* doctrine, *see, e.g., McClanahan,* 795 F.2d at 516[4], however, the real defense of fraud in the factum, that is, fraud that renders a document void *ab initio,* can be asserted against the FDIC because from the outset such a document confers no right, title or interest in the FDIC that could be diminished or defeated. *Langley v. Federal Deposit Ins. Corp.,* 484 U.S. 86, 93–94, 108 S.Ct. 396, 402, 98 L.Ed.2d 340 (1987). In *McClanahan,* there was an $86,000 note that had been forged; when the FDIC took over the bank that was the creditor on the note, it assumed that the note was good. However, the fact that the FDIC's expectations would be defeated by recognition of the forgery defense did not prevent the Fifth Circuit from concluding that the FDIC could not have sued the putative maker whose name had been forged. 795 F.2d at 515.

The Fifth Circuit has repeatedly recognized that the *D'Oench, Duhme* doctrine will not revive a void instrument. *See, e.g., Federal Deposit Ins. Corp. v. Plato,* 981 F.2d 852, 857 (5th Cir.1993). In other words, the doctrine cannot be used to cut off a claim of fraud in the factum such as forgery. *See Langley,* 484 U.S. at 93–94, 108 S.Ct. at 402–403; *Jack Parker Indus. v. Federal Deposit Ins. Corp.,* 769 S.W.2d 700, 703–04 (Tex. App.—El Paso 1989, no writ). Thus, the Nelsons' claim that the *D'Oench, Duhme* doctrine and section 1823(e) would prevent their assertion that the subordination agreement was forged and that the forgery could be relied on by the FDIC is without merit. The case law clearly holds that once it was established that the subordination agreement was forged, and there is no dispute that it was, neither *D'Oench, Duhme* nor section 1823(e) can revive the document.

The Nelsons attempt to distinguish *Langley* arguing that the forgery in this case does not involve the instrument that passed title

to First Bank and ultimately to the FDIC; rather, the forged instrument here simply established the priority of liens between the Nelsons and First Bank. The Nelsons based their argument on the language in *Langley* which states that fraud in the factum cannot be cut off by *D'Oench, Duhme* because a void instrument leaves no interest or title that could be diminished or defeated. *See Langley,* 484 U.S. at 93–94, 108 S.Ct. at 402–403. We find their distinction unpersuasive. Though it is true that the actual documents that passed title to First Bank, and subsequently to the FDIC, were not forged, there was no first lien interest passed to First Bank that could be diminished or defeated because the subordination agreement was a forgery. *See Langley,* 484 U.S. at 93–94, 108 S.Ct. at 402–403. If the subordination agreement had not been forged, First Bank's interest in the property would have been an unencumbered first lien position with an unchallenged right to foreclose on the property. However, because the subordination agreement was forged, First Bank did not get a first lien interest in the property. Thus, there was no first lien interest, i.e., the interest that First Bank believed it acquired, that could be diminished or defeated. *See id.* Thus, we hold that *Langley* is not distinguishable and the forgery claim in this case cannot be defeated by *D'Oench, Duhme.*

Based on the above discussion, we hold that neither the *D'Oench, Duhme* doctrine or section 1823(e) defeats the Nelsons' first lien position. Therefore, the trial court did not err in finding that the *D'Oench, Duhme* defense was inapplicable in this case.

■ The Nelsons also argue the trial court erred in finding that they had a valid first lien because they presented expert testimony supporting their claim that their lien was invalid and that this testimony was uncontradicted.[5] This argument is without merit. Whether the Nelsons held a valid first lien on

---

4. Other defenses that are cut off by the doctrine include misrepresentation and failure of consideration. *See, e.g., Federal Deposit Ins. Corp. v. Cardinal Oil Well Servicing Co.,* 837 F.2d 1369, 1372 (5th Cir.1988) (defense of misrepresentation); *McClanahan,* 795 F.2d at 516 (failure of consideration). These defenses are sometimes called "personal defenses." John Krahmer,

*Commercial Transactions,* 44 Sw.L.J. 171, 183 n. 147 (1990).

5. Though it is irrelevant, the record reflects that appellants did attempt to contradict the Nelsons' expert testimony through cross-examination.

the property was a question of law for the court. First, whether the *D'Oench, Duhme* doctrine or section 1823(e) was applicable and supported the Nelsons claim that their first lien was invalid was a question of law for the court. *See Wisenbarger v. Gonzales Warm Springs Hosp.*, 789 S.W.2d 688, 691 (Tex.App.—Corpus Christi 1990, writ denied) (holding that whether a particular legal principal is applicable in a case or governs a case is a matter of law for the trial court). Second, construction and effect of written instruments, in this case the effect of the title documents including the subordination agreement, is a question of law for the court. *See City of Pinehurst v. Spooner Addition Water Co.*, 432 S.W.2d 515, 518 (Tex.1968). Specifically, title to property as shown by property records is a question of law for the court. *Southwest Indus. Investment Co. v. Greene Home Owners Ass'n, Inc.*, 608 S.W.2d 758, 760 (Tex.Civ.App.—Dallas 1980, no writ); *Hodge v. Ellis*, 268 S.W.2d 275, 289 (Tex.Civ. App.—Fort Worth 1954), *aff'd in part and rev'd in part*, 154 Tex. 341, 277 S.W.2d 900 (1955). While a qualified expert, relying on proven facts, may express his opinion about title to the court, the decision is still a question of law to be determined by the court. *Southwest Indus.*, 608 S.W.2d at 760. Matters of law are not proper subjects for expert opinion. *Schauer v. Memorial Care Sys.*, 856 S.W.2d 437, 451 (Tex.App.—Houston [1st Dist.] 1993, no writ).

The Nelsons' next argument is that the trial court erred in ruling that they have a valid first lien on the property because it "shifts the burden of payment from the parties that created the problem, the Commonwealth entities, to innocent parties, the Bonners." They also argue that imposition of the lien would penalize them because they would have to pay for the enhancement in the value of the property. This argument is without merit for two reasons.

■ First, any "burden" on the Bonners is irrelevant to the question of whether the Nelsons' first lien is valid. The first lien is either valid or invalid as a matter of law. Thus, while the Bonners may have claims against their seller or even their title insurance company for their own title problems, it is of no consequence to a decision concerning the validity of the Nelsons' first lien position. Second, while it was stipulated that the Bonners spent $54,700 on improvements, there was no evidence or jury finding as to the enhancement of the value of the property as a result of the improvements. In *Sharp v. Stacy*, 535 S.W.2d 345, 351 (Tex.1976), the court held that a person who in good faith makes improvements on property owned by another is entitled to compensation. The measure of compensation to that claimant is not the original cost of the improvements, but the enhancement in the value of the land by reason of the improvements. *Id.* The claimant must present evidence and secure a jury finding on the issue of enhancement value or the claimant is precluded from recovering. *See id.* Thus, any evidence concerning the amount of the improvements was irrelevant and does not provide a basis for the Nelsons' claim that the trial court erred in finding that the Nelsons have a valid first lien.

The Nelsons also claim that the trial court erred in holding that they have a valid first lien because their pleadings do not support the trial court's actions because they non-suited their request for a judicial foreclosure before entry of the final judgment. This argument fails for several reasons.

■ First, even if the Nelsons properly non-suited their request for reformation/rescission, Commonwealth's own defensive pleadings are sufficient to support the trial court's ruling that the Nelsons have a good and valid first lien. Even without considering the Nelsons' pleadings, Commonwealth's pleadings put the first lien issue squarely before the trial court. The fact that Commonwealth believed that the Nelsons' first lien position was good was its entire defense. In a determination of whether issues and questions are supported by the pleadings at the trial level, the trial court will supply omissions in the pleadings of one party by referring to the allegations contained in the pleadings of another. *Lacy v. First Nat'l Bank of Livingston, Texas*, 809 S.W.2d 362, 365 (Tex.App.—Beaumont 1991, no writ) (citing *Land Title Co. of Dallas v. F.M. Stigler, Inc.*, 609 S.W.2d 754 (Tex.1980)).

■ Second, we agree with Commonwealth that the issue of the validity of the first lien was tried by consent. *See* TEX. R.CIV.P. 67. At trial, the Nelsons, over strenuous objections by Commonwealth, introduced extensive testimony from two attorneys. Both of these "experts" testified specifically that the Nelsons did not have a valid first lien. It is clear from the record that both sides vigorously advanced their respective positions concerning the validity of the lien at trial. Under our rules, unpleaded claims or defenses that are tried by express or implied consent of the parties are treated as if they had been raised by the pleadings. *Roark v. Stallworth Oil & Gas, Inc.*, 813 S.W.2d 492, 495 (Tex.1991). *See also Sage Street Assoc. v. Northdale Constr. Co.*, 863 S.W.2d 438, 445 (Tex.1993). Because the validity of the lien was clearly tried by consent, the Nelsons cannot claim lack of pleadings to overturn the trial court's decision.

■ Lastly, we hold that the Nelsons' attempt to non-suit their claim for reformation/rescission was untimely and the trial court erred in granting that motion. Texas Rule of Civil Procedure 162 sets up the proper time limits for dismissal or non-suit and states, in pertinent part:

> At any time before the plaintiff has introduced all of his evidence other than rebuttal evidence, the plaintiff may dismiss a case, or take a non-suit, which shall be entered in the minutes. Notice of the dismissal or non-suit shall be served in accordance with Rule 21a on any party who has answered or has been served with process without necessity of court order.

TEX.R.CIV.P. 162.

Here, the record reflects that the Nelsons closed and rested on May 11, 1992, but did not attempt to non-suit any claim until the next day. Thus, their attempt to non-suit was ineffective and the trial court erred in granting their motion. *See Martini v. Tatum*, 776 S.W.2d 666, 669 (Tex.App.—Amarillo 1989, writ denied) (holding that motion to dismiss a cause of action after the close of evidence was untimely under rule 162).

■ Based on all of the above, we hold that the trial court did not err in granting a judgment that took away damages for subparts "b" and "c" because the court correctly found that the Nelsons have a valid first lien on the property. While we agree with Commonwealth that the trial court correctly ruled that the Nelsons have a valid first lien on the property, we must still determine whether the trial court erred in rendering judgment for the Nelsons for damages based on the jury verdict. Commonwealth argues that because the Nelsons have a good and valid first lien against the property they are not entitled to prevail on any claim or recover any damages. We agree based on the Texas Supreme Court's holding in *Chicago Title Ins. Co. v. McDaniel*, 875 S.W.2d 310 (Tex. 1994).

In *McDaniel*, Jerry and Christina McDaniel purchased a home from Couch Mortgage Company (Couch) in 1983. 875 S.W.2d at 310. The couple purchased a title insurance policy from Chicago Title Insurance Company (Chicago Title). *Id.* The policy provided that Chicago Title "... for value does hereby guarantee to the insured ... good and indefeasible title to the estate or interest in the land described or referred to in this policy." *Id.*

In December of 1988, the McDaniels learned from the bankruptcy trustee for Couch that the property they purchased was subject to a preexisting lien that had been filed and recorded approximately five months prior to their purchase. *Id.* The McDaniels abandoned the property in October of 1989. *Id.* Three months later, a federal bankruptcy court ruled that the McDaniels' purchase money lien was superior to the preexisting lien. *Id.* Notwithstanding that finding, the McDaniels brought suit against Chicago Title claiming violations of the DTPA. *Id.*

Chicago Title moved for summary judgment and the motion was granted by the trial court. In affirming the trial court's judgment, the Texas Supreme Court stated that a title insurance policy is a contract of indemnity. *Id.* at 311. The only duty imposed by a title insurance policy is the duty to indemnify the insured against losses caused by defects in title. *Id.* (citing *Martinka v. Commonwealth Land Title Ins. Co.*, 836 S.W.2d 773, 777 (Tex.App.—Houston [1st Dist.] 1992, writ

denied) and *Stewart Title Guar. Co. v. Cheatham,* 764 S.W.2d 315, 320–21 (Tex.App.—Texarkana 1988, writ denied)).

All of the Nelsons' claims against Commonwealth, including those on which the trial court granted instructed verdict and judgment notwithstanding the verdict in favor of Commonwealth, fail based on the facts and the court's holding in *McDaniel.* The only duty imposed on Commonwealth was the duty to indemnify the Nelsons against losses caused by title defects. *See McDaniel,* 875 S.W.2d at 311. We have held that the trial court correctly determined that the Nelsons have a good and valid first lien on the property. Therefore, there was no title defect that required Commonwealth to indemnify the Nelsons. Commonwealth pointed this out to the Nelsons after receiving the demand letter from the Nelsons' attorney. In that letter Commonwealth advised the Nelsons that "... the insureds presently possess a lien against the subject property which is and always has been superior to the lien in favor of First Bank & Trust identified in the Subordination Agreement."

We hold that the trial court correctly determined that the Nelsons have, and have always had, a good and valid first lien on the subject property. Appellees'/cross-appellants' first cross-point is overruled. Further, because all of the Nelsons' claims and theories of recovery are premised upon the erroneous assumption that there was a title defect, i.e, that they did not have a valid first lien, they suffered no compensable damages. Therefore, we hold that the trial court erred in submitting any issues to the jury and in rendering any judgment in favor of the Nelsons. Appellants' first point of error is sustained. Because we have sustained appellants' first point of error, it is unnecessary to address their remaining points.

In their cross-appeal, the Nelsons raised fifteen cross-points. We have overruled their first cross-point and find that based on our holding that the Nelsons are not entitled

to recover any damages from Commonwealth, it is unnecessary to address their remaining cross-points because they concern complaints as to other liability issues and requests for additional damages. The judgment of the trial court is reversed and we render judgment in favor of Commonwealth holding that the Nelsons take nothing from either Commonwealth Title or Commonwealth Insurance.[6]

---

**6.** We wish to point out that Commonwealth Land Title Company of Houston, Inc. and Commonwealth Land Title Insurance Company were the only parties, excluding the Nelsons' cross-appeal, to appeal from the trial court's judgment. Because we have reversed and rendered judgment

in favor of the appellants, they are no longer liable to the Nelsons either individually or joint and severally. Those portions of the trial court's judgment against D'Anna and Clayton individually were not appealed and therefore, are undisturbed by any holding in this opinion.